**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 2:18-cv-02637-JPM/tmp |
| SHELBY COUNTY GOVERNMENT; | ) | Jury Demanded |
| CHIEF KIRK FIELDS, | ) | |
| Interim Director Shelby County Jail; | ) | |
| UNKNOWN JAILER 1; and | ) | |
| FLOYD BONNER, current Sheriff of | ) | |
| Shelby County, as Successor to BILL | ) | |
| OLDHAM, individually and in their | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING SUMMARY JUDGMENT**

Before the Court is Defendant Shelby County's Amended Motion for Summary Judgment, filed on January 15, 2020. (ECF No. 60.) Plaintiff John Doe filed a Response on February 17, 2020. (ECF No. 68.) Defendants filed their Reply on March 2, 2020. (ECF No. 69.) For the following reasons, Defendants Motion for Summary Judgment is GRANTED.

**I.     BACKGROUND**

This action arises out of John Doe's report of sexual assault by his cell mate during a term of confinement at the Shelby County Criminal Justice Center at 201 Poplar Avenue, Memphis, Tennessee (hereinafter "Shelby County Jail"). Plaintiff asserts that the sexual assault during his confinement constitutes a violation of his constitutional rights and that he is entitled to recover from Shelby County. (ECF No. 1-1.)

### A.  Undisputed Facts

The following facts are undisputed based on Plaintiff's Response to Defendants' Statement of Undisputed Facts (ECF No. 67-1) and in accordance with Local Rule 56.1(b).  Local Rule 56.1(b) sets out the response options for the non-moving party:

> Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either:
>
> 1)  Agreeing that the fact is undisputed;
> 2)  Agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or
> 3)  Demonstrating that the fact is disputed.

When the non-moving party disputes essential material facts, "[e]ach such disputed fact shall be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute." L.R. 56.1(b)(3).  Compliance or non-compliance with the local rule can be determined by comparing the moving party's statement of undisputed facts (see in the instant case, ECF No. 60-2) with the respondent's statement of undisputed facts (see ECF No. 67-1.)  If the non-moving party fails to respond to a moving party's statement of material facts within the time periods provided by the rules, the Court assumes that the "asserted facts are not disputed for purposes of summary judgment." L.R. 56.1 (d); see, e.g., Provost v. Crockett County, 2018 WL 4224907 at *3 (W.D. Tenn. Sep. 5, 2018) ("If Plaintiffs fail to demonstrate that a fact is disputed or fail to address Defendants' statement of facts properly, the Court will 'consider the fact undisputed for purposes' of ruling on the motion[.]").

Plaintiff John Doe was first arrested in 2017 for allegedly stealing a car.  (ECF Nos. 60-2 ¶ 34; 67-1 ¶ 34.)  In May 2018, Plaintiff was arrested again, leading to his placement at Shelby County Jail.  (Id. ¶ 35.)  In response to questions about the underlying conduct resulting in his May 2018 arrest, Plaintiff invoked his Fifth Amendment rights and declined to answer.  (Id. ¶ 37.)

Plaintiff was interviewed once for screening purposes on May 15, 2018, and again for classification purposes on May 22, 2018.  (Id. ¶ 40.)

At the time of Plaintiff's initial screening on May 15, 2018, Plaintiff was 22 years old, stood in the range of 5 feet 6 inches and 5 feet 8 inches, and weighed between 120 and 142 pounds. (ECF Nos. 60-2 ¶ 44; 67-1 ¶ 44.)  At Plaintiff's initial screening on May 15, 2018, he indicated that his criminal history was not exclusively non-violent and that he had previously received mental treatment at Lakeside (a mental health facility).  (Id. ¶¶ 41, 44.)  Plaintiff further indicated that he identifies as straight, which is confirmed by both of his intake screening forms.  (Id. ¶ 42.). On Plaintiff's intake forms, he indicated that he does not identify as gay, bisexual, transgender, intersexual, or gender nonconforming.  (Id. ¶ 42.)  Both of Plaintiff's intake screening forms also note that this instance was not his first major incarceration, that he had no reason to fear placement in general population, that he had not been sexually assaulted or abused as a child, that he had not been approached for sex or threatened with sexual assault while incarcerated, and that he had not been previously assaulted while incarcerated.  (Id. ¶ 43.). Plaintiff alleges that he was sexually assaulted and/or raped by inmate and cellmate Rashawn Jones while housed in a cell with him at Shelby County Jail.  (ECF No. 1-1.)

Rashawn Jones was screened, and according to the intake forms, he was 18 years old, stood between 5 feet 5 inches and 5 feet 6 inches, and weighed 135 pounds.[1]  (ECF Nos. 60-2 ¶ 46; 67-1 ¶ 46.)  Furthermore, Inmate Jones had previously received mental health treatment at Lakeside, and had been transferred from Shelby County Juvenile Court to Shelby County Jail with multiple

---

[1] The Defendants' statement of facts describes Jones as shorter and potentially weighing less than the Plaintiff. (ECF No. 60-2 at PageID 732.)  Because this is contradicted by Jones intake form, and because disputed facts are taken in the light most favorable to the non-movant, the analysis will proceed under the assumption that the intake form is accurate.

counts of robbery, aggravated robbery, and carjacking.[2]  (Id. ¶ 46.)

During the screening process, Jones denied any criminal history of sex offenses or histories of sexual victimization.  (ECF Nos. 60-2 ¶ 47; 67-1 ¶ 47.)  Per Jail policy, inmates may not be housed in cells with other inmates until they have been screened and classified by the Classification Office.  (Id. ¶ 14.)  "The Classification Office is staffed with Jail Processing Specialists who are trained in inmate intake, screening, and classification." (Id. ¶¶ 1, 15.)[3]  "The Jail Processing Specialists receive specialized classification training in conformance with the professional standards established by the American Correctional Association ("ACA") and the National PREA Policy Center."  (Id. ¶¶ 1, 16.)[4]  "The Jail Processing Specialists/the Classification Office have standard operating procedures ("SOP") which govern inmate classification and these operating procedures require, at a minimum, an inmate's mental and emotional stability, history of assaultive behavior, medical status, and age; and youthful offenders receive consideration regarding their physical, mental, social, and educational maturity."  (Id. ¶¶ 1, 17.)[5]  Jail Processing Specialists rely on the inmates' intake information to make a determination as to the best housing location.  (Id. ¶ 20.)

Under SOP 347, inmates can be housed in single cells if they have severe medical

---

[2] The Plaintiff disputes Jones' weight and height, but not his age, mental health treatment, or alleged crimes.  (ECF No. 67-1 ¶¶ 45–46.)

[3] The Plaintiff objects that the statement is "vague and overbroad[, and t]o the extent that any of the policies as noted are alleged to be adequate to protect the Plaintiff's 8th and 14th Amendment rights, this is disputed." (Id. at PageID 918.)  This objection fails to adequately articulate how the fact is inaccurate, or point to a source in the record that disputes the factual assertion.  The Plaintiff does not seem to deny the existence of a classification office, or that the office is staffed with employees who receive training on how to work in the office.  Instead, he points to the sufficiency and role of the office, but does not cite to the record as required by Local Rule 56.1(b).

[4] The Plaintiff makes the same objection to this fact as the previous fact.  However, he does not point to anywhere in the record to dispute it or otherwise articulate the factual dispute.  The record indicates that these specialists received this training.  The Court finds that there is a dispute as to whether this was adequate to protect the Plaintiff from harm.

[5] The Plaintiff makes the same objection to this fact as the previous fact.  However, he does not point to anywhere in the record to dispute it or otherwise articulate the factual dispute.  The record indicates that these factors were considered.  The Court finds that there is a dispute as to whether this was adequate to protect the Plaintiff from harm.

disabilities, suffer from serious mental illness, are themselves sexual predators, or are likely to be exploited or victimized by others. (ECF Nos. 60-2 ¶ 18; 67-1 ¶ 18.) The "Jail Processing Specialists rely on the inmates' intake information to make a determination as to housing location. (Id. ¶ 20.)

Inmates are housed in sections called Pods. (ECF Nos. 60-2 ¶ 6; 67-1 ¶ 6.) F-Pod is "primarily reserved for inmates 18–25 years old who have displayed good behavior in the jail and wish to participate in the Jail's inmate programs."[6] (Id. ¶ 9.) Inmates are screened before they are assigned to pods or otherwise housed with cellmates. (Id. ¶ 14.) Prior to being housed together, both inmates had been screened and classified by the Classification Office. (Id. ¶ 39.) Plaintiff and Jones were cellmates both housed in F-Pod in June 2018. (Id. ¶ 38.) While Plaintiff was housed with Jones, Jones was being prescribed and was taking medication. (Id. ¶ 50.)

The Shelby County Sheriff's Office maintains polices on the prevention of prison rape and sexual assault in the Shelby County Jail. (ECF Nos. 60-2 ¶ 1; 67-1 ¶ 1.) These policies include a "zero-tolerance policy for inmate-on-inmate sexual contact." (Id. ¶ 3.) The Shelby County Jail also employs a PREA Coordinator, Patricia Dixon, who is responsible for ensuring compliance with PREA, including ensuring that PREA claims are investigated properly and promptly, and that all inmates are aware of their rights and protections under PREA while housed at the Shelby County Jail.[7] (Id. ¶ 5.)

The Shelby County Jail is accredited by ACA and the Tennessee Correctional Institute. (ECF Nos. 60-2 ¶ 19; 67-1 ¶ 19.) Shelby County Jail's medical provider is accredited by the

---

[6] The Plaintiff disputes this fact but does not explain why. The record appears to be clear that F-Pod is designated for "young offenders," but the Court finds that the safety of the pod, as asserted by the Defendants, is disputed.
[7] The Plaintiff deletes part of this factual assertion, but does not explain why, stating only "The Plaintiff does not dispute that there is a PREA coordinator, Patricia Dixon." (ECF No. 67-1, ¶ 5.) However, the Plaintiff does not point to any citation in the record to suggest that the PREA Coordinator is not tasked with the descriptions as listed by the government. Accordingly, the dispute of this fact is not in compliance with Local Rule 56.1(b).

National Commission on Correctional Health and PREA compliance is part of their accreditation process.  (Id.)  Shelby County Jail also provides some PREA training to Corrections Deputies, which lasts roughly ten weeks, along with in-service training after the completion of basic training.[8]  (Id. ¶¶ 22–23, 25.)  The Deputies are trained on, and required to follow, the Sheriff's Office rules and Standard Operating Procedures (SOPs).  (Id. ¶ 26.)  Deputies can be disciplined for violating SOPs, and all updates to the SOPs are distributed to the Deputies.  (Id. ¶ 27.)  Corrections Deputies are assigned to monitor all pods twenty-four hours a day.  (Id. ¶ 28.)  In all general population pods, including F-Pod, the Corrections Deputy assigned to the Pod is required to make rounds throughout the Pod, observing into the inside of cells, roughly every thirty (30) minutes.  (Id. ¶ 29.)  The timing of rounds sometimes varies slightly to keep rounds from being predictable to the inmates.  (Id. ¶ 30.)  Inmates are not permitted to put any sort of visual barrier in their cell that would prevent a Corrections Deputy from being able to view into the cell while making rounds and/or wellness checks.  (Id. ¶ 31.)  The most important things that the Corrections Deputies are required to ensure in making rounds are that the inmates are alive and well, not being assaulted, and are not engaging in any conduct prohibited by PREA.  (Id. ¶ 32.)  Corrections Deputies also conduct random cell searches.  (Id. ¶ 33.)

Each of the rapes or sexual assaults against Plaintiff by Inmate Jones lasted about ten minutes.  (ECF Nos. 60-2 ¶ 51; 67-1 ¶ 51.)  Plaintiff eventually notified Shelby County Jail personnel after the assaults by Inmate Jones.  (Id. ¶ 52.)  Plaintiff and Jones were then immediately separated.  (Id. ¶ 53.)  Plaintiff was not made to continue housing in the same cell as Jones after notifying Jail personnel of the attack. Instead, Plaintiff was taken to protective custody.  (Id. ¶ 54.)

---

[8] The Plaintiff disputes the exact nature of the training, stating that "these witnesses testified that most of the training was targeted toward reporting of sexual assaults after it occurred" but does not dispute that "deputies receive in-service training."  (ECF No. 67-1 ¶¶ 22–23, 25.)

The results of the forensic examination, and other items of physical evidence relevant to the alleged attack, were brought to the Tennessee Bureau of Investigation for rape kit and other forensic testing. (Id. ¶ 55.)

## II.     Legal Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense." Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 776 (6th Cir. 2012).

"In considering a motion for summary judgment, [the] court construes all reasonable inferences in favor of the non-moving party." Robertson v. Lucas, 753 F.3d 606, 614 (6th Cir. 2014) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." Mosholder v. Barnhardt, 679 F.3d 443, 448 (6th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." Mosholder, 679 F.3d at 448-49; see also Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587. "When the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 914 (6th Cir. 2013) (quoting Chapman v. UAW Local 1005, 670 F.3d 677, 680 (6th Cir. 2012) (en banc)) (internal quotation marks omitted).

In order to "show that a fact is, or is not, genuinely disputed," a party must do so by "citing to particular parts of materials in the record," "showing that the materials cited do not establish the absence or presence of a genuine dispute," or showing "that an adverse party cannot produce admissible evidence to support the fact." L.R. 56.1(b)(3); Bruederle, 687 F.3d at 776 (alterations in original) (quoting Fed. R. Civ. P. 56(c)(1)); see also Mosholder, 679 F.3d at 448 ("To support its motion, the moving party may show 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting Celotex, 477 U.S. at 325)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" Martinez, 703 F.3d at 914 (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he district court has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'" Pharos Capital Partners, L.P. v. Deloitte & Touche, 535 Fed. Appx. 522, 523 (6th Cir. 2013) (per curiam) (quoting Tucker v. Tennessee, 539 F.3d 526, 531 (6th Cir. 2008), abrogation recognized by Anderson v. City of Blue Ash, 798 F.3d 338 (6th Cir. 2015)).

The decisive "question is whether 'the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law.'" Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015) (quoting Liberty Lobby, 477 U.S. at 251-52). Summary judgment "'shall be entered' against the non-moving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.'" Rachells v. Cingular Wireless Employee Servs., LLC, No. 1:08CV02815, 2012 WL 3648835, at *2 (N.D. Ohio Aug. 23, 2012) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990)). "[A] mere 'scintilla' of evidence in support of the non-

moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor." Tingle v. Arbors at Hilliard, 692 F.3d 523, 529 (6th Cir. 2012) (quoting Liberty Lobby, 477 U.S. at 251). "[I]n order to withstand a motion for summary judgment, the party opposing the motion must present "affirmative evidence" to support his/her position." Mitchell v. Toledo Hosp., 964 F.2d 577, 584 (6th Cir. 1992) (citing Liberty Lobby, 477 U.S. at 247-254; Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)). "[C]onclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment." Rachells, 2012 WL 3648835, at *2 (quoting Thomas v. Christ Hosp. and Med. Ctr., 328 F.3d 890, 894 (7th Cir. 2003)). Statements contained in an affidavit that are "nothing more than rumors, conclusory allegations and subjective beliefs" are insufficient. See Mitchell, 964 F.2d at 584-85.

### III.    Analysis

42 U.S.C. § 1983 provides that "every person, who under color of state statute, ordinance, regulation, custom, or usage of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution … shall be liable to the party injured in an action at law." 42 U.S.C. § 1983 (2020). Municipalities can be held liable for constitutional violations under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dep't of Soc. Servs. Of New York, 436 U.S. 658, 694 (1978). A municipality is not liable under § 1983 "*solely* because it employs a tortfeasor— or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior*

9

theory." Id. at 659 (emphasis in original).  Additionally, in order to establish municipal liability under § 1983, "a plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged." Rayfield v. Grand Rapids, 768 F. App'x 496, 510 (6th Cir. 2019) (quoting Bd. Of Comm'rs of Bryan Cty. V. Brown, 520 U.S. 397, 404 (1997) (internal quotations omitted).

A determination of "moving force" can be imputed via a policy or custom of the municipality. See, e.g., Monell, 436 U.S. at 694.  To successfully bring a claim against a local government under 42 U.S.C. § 1983, a plaintiff must establish that the local government's "policy or custom cause[d] the constitutional violation in question." Miller v. Calhoun Cty., 408 F.3d 803, 813 (6th Cir. 2005); see also Miller v. Sanilac Cnty., 606 F.3d 240, 254-55 (6th Cir. 2010); Waters v. City of Morristown, Tenn., 242 F.3d 353, 362 (6th Cir. 2001).  There are "four avenues a plaintiff may look to prove the existence of a municipality's policy or custom[:] "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013).

The present action is brought under 42 U.S.C. § 1983 as a failure to protect claim.  (ECF No. 1-1.)  Plaintiff alleges that he was raped in prison, and that Defendants knew or should have known that he was at high risk of sexual victimization given his age, size, and mental state.  (Id. ¶ 13.)  Further, Plaintiff alleges that Defendants should not have placed him with a prisoner with a history of violence, particularly given the intake interview and screening.  (Id. ¶ 12.)  Specifically, Plaintiff alleges that the Interim Director of the Jail, an unidentified jailer, and the Sheriff (and his successor), failed to protect the Plaintiff's constitutional rights.  (Id. ¶ 20.)  Finally, Plaintiff also

asserts that the Shelby County government failed to adequately train its employees.  (ECF No. 67-2.)  The question in front of this Court is whether Shelby County, through the applicable paths to municipal liability, can be held liable for Plaintiff's alleged Constitutional violation.

### A) Shelby County's Legislative Enactments or Official Agency Policies Were Not the Moving Force behind the Injury Alleged

Liability for § 1983 violations attaches to policies such that a "municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or those officials whose acts may fairly be said to be those of the municipality."  Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 403–404 (1997) (citing Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 694 (1978)).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  Connick v. Thompson, 563 U.S. 51, 61 (2011).  Furthermore, policy in this context reflects "a deliberate choice to follow a course of action" that is "made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  Pembaur v. Cincinnati, 475 U.S. 469, 483 (1986) (internal citation omitted).  Because policymaking is often spread across various officers and bodies, the allegation must rise to more than an application of respondeat superior; policy generally implies a course of action consciously taken from various alternatives and not just through single actions of unlawful actors.  Id. at 483–84.  This "course of

action must be shown to be the moving force behind or cause of the plaintiff's harm." Id. at 484–85.

Plaintiff alleges that Interim Director Kirk Fields, John Doe Jailer, Sheriff Bill Oldham, and Sheriff Floyd Bonner had a legal obligation to protect Plaintiff from assault and sexual attack. (ECF No. 1-1 at PageID 10.)  This is true.  Prison officials owe a duty to inmates to "provide humane conditions of confinement," including "adequate food, clothing, shelter, and medical care, and to protect prisoners from violence at the hands of other prisoners."  Farmer v. Brennan, 411 U.S. 825 (1994).  There is a separate question of whether a Constitutional violation occurred, which is assessed under the "deliberate indifference" standard.  See, e.g., Connick v. Thompson, 563 U.S. 51, 61 (2011) ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.") (internal citations and quotations omitted).  The Court does not reach this issue.  For the purposes of this Order, the Court assesses liability on behalf of Shelby County based on the existence of a Constitutional violation.

The question is whether, in light of an alleged Constitutional violation, liability can attach to Shelby County.  Plaintiff is aware of this burden.  (ECF No. 67-2 at PageID 937 ("Put simply, if there is a constitutionally suspect policy, the Plaintiff must demonstrate that there is a causal link between that policy and the harm caused to the plaintiff.").)  Plaintiff takes issue with Shelby County Policies 838, 839, and 847—arguing that they are inadequate to address the problem of sexual assault.  (Id.)  In particular, Plaintiff points to the lack of guidance in Policy 839, which classifies individuals as high risk for sexual victimization, but does not provide further guidance on the same.  (Id. at PageId 938.)  Imperfect policies are not necessarily unconstitutional.  See Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985) ("[S]ome limitation must be placed on

12

establishing municipal liability through policies that are not themselves unconstitutional…Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official…At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged.")

Shelby County maintains policies on the prevention of prison rape and sexual assault, including a "zero tolerance" policy for inmate-on-inmate sexual contact. (ECF Nos. 60-2 ¶ 1; 67-1 ¶ 1.) Shelby County employs a PREA Coordinator to comply with the PREA and investigate rape, as well as Jail Processing Specialists who conduct intake screening before housing inmates. (ECF Nos. 60-2 ¶¶ 5, 12–1; 67-1 ¶¶ 5, 12–17.) This classification system includes assessment of an inmate's mental state, history of assault, medical status, and age, which is used to determine where to house an inmate. (ECF Nos. 60-2 ¶ 17; 67-1 ¶ 17.) Corrections Deputies are assigned to monitor all pods twenty-four hours a day, conduct rounds and random cell searches, and generally ensure that inmates are alive and not engaging in conduct prohibited by the PREA. (ECF Nos. 60-2 ¶¶ 27–32; 67-1 ¶¶ 27–32.) Liability for the policy prong has been found where a plaintiff has shown some course of action causing the injury at issue. (See, e.g., Pembaur, 475 U.S. at 484–85 (finding that the final decision maker ordered deputies to violate plaintiff's Fourth Amendment right by entering his medical clinic).) Here, Plaintiff has failed to show that legislative enactments or policies were the moving force behind his assault. Viewing the facts in the light most favorable to Plaintiff, the Court finds that Shelby County had adequate policies in place to classify inmates and comply with PREA. Even if a constitutional violation occurred, Plaintiff has not sufficiently tied the assault to an unconstitutional policy. Tying an allegedly imperfect application of existing

policies would amount to *respondeat superior* liability, which is the exact type of liability prohibited by Monell.  Burgess, 735 F.3d at 479.

## B) The Record Does Not Demonstrate that Shelby County Has a Custom of Tolerance or Acquiescence of Federal Civil Rights Violations

Plaintiff's alternative theory of municipal liability, namely that Shelby County "was well aware before June 2018 that there was a serious and long standing problem[] with violence, gangs and rape at the Shelby County Jail" (ECF No. 1-1 at PageID 8) similarly does not support a finding of municipal liability under § 1983.  A municipality's "custom of tolerance or acquiescence of federal rights violations" is one of the four recognized grounds for municipal liability under § 1983. Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005).  In order to prove that the City's "custom of tolerance or acquiescence of federal rights violations" caused his constitutional violation, Plaintiff must demonstrate that the flaws in the City's investigation of his arrest and prosecution were indicative of "(1) a clear and persistent pattern of illegal activity, (2) which the [City] knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the [City's] custom was the cause of [the constitutional violation]." Id. at 433 (quoting Doe v. Claiborne Cty., 103 F.3d 495, 508 (6th Cir. 1996)).  Evidence of a single improper internal investigation or disciplinary decision without more does not support an inference of a municipality-wide policy of indifference to its citizens' constitutional rights.  Id. at 432–34.

Thomas v. City of Chattanooga is particularly instructive. In Thomas, the plaintiffs brought claims against both a group of police officers and the City of Chattanooga, alleging that 13 defendant officers' shooting of one of the plaintiffs violated his Fourth Amendment rights. Thomas, 398 F.3d at 426–28.  The plaintiffs named the municipality as a defendant in the suit, alleging that the municipality's internal investigation, which determined that the shooting was

justified, constituted a custom, policy, or practice of indifference to its citizens' constitutional rights. Id. at 428, 432–33. The Sixth Circuit addressed the question of whether "there was some sort of policy, custom, or practice in the Chattanooga Police Department of condoning excessive force," which, under its earlier holding in Doe v. Claiborne Cty., 103 F.3d 495 (6th Cir. 1996), required that the policy be "shown by a clear and consistent pattern." Id. at 432. The Court concluded that the city's allegedly improper or insufficient investigation into the shooting did not support Monell liability, because the plaintiffs' expert's conclusions supporting the municipal liability claim "did not reach beyond the facts of th[e] case to show any possibility of a pattern." Id. at 433–34.

Plaintiff's claim that Shelby County's inadequate classification and inadequate timeliness in making rounds amounts to a custom or practice of deliberate indifference to its inmates' constitutional rights is analogous to the Thomas plaintiffs' allegations. Plaintiff, much like the plaintiffs in Thomas, has not provided evidence of other instances beyond his own mistreatment. Allowing Plaintiff's single incident to support a finding of municipal liability would "result in the collapsing of the municipal liability standard into a simple *respondeat superior* standard." Id. at 432–33.

First, the Plaintiff points to a series of news articles that report on conditions within Shelby County Jails. (ECF No. 1-1 at PageID 8–9.) This is legally inadequate to prove "a custom of tolerance or acquiescence of federal rights violations." See, e.g., Beck v. Hamblen County, 969 F.3d 592, 602 (6th Cir. 2020) (Rejecting district court's reliance on Fisher v. Cocke County, 1996 WL 520793 (6th Cir. Sept. 12, 1996), noting that "Fisher did not clearly establish what such a 'case' for liability would require.") The Plaintiff's argument would require that every inmate who asserts any mental illness would be provided his or her own cell. Courts do not micromanage

determinations of the jail.  See LaFountain v. Harry, 716 F.3d 944, 948 (6th Cir. 2013) ("Absent unusual circumstances, prison officials,  rather than judges, should decide where a particular prisoner should be housed.").

Furthermore, nothing that Plaintiff points to in the record suggests a "clear and persistent" pattern of unconstitutional conduct.  For example, Plaintiff points to a January 2001 article titled "The Jail from Hell," which spells out the known dangers at the Shelby County Jail.  (Id.)  Plaintiff also points to statements by the Shelby County Sheriff in 2008 admitting that there is a problem of sex in jails, along with the Little v. Shelby County Consent Order.  (Id. at PageID 9–11.)  These articles certainly outline the problems at Shelby County in the past, but do not point to a "clear and persistent" pattern of conduct at the time of Plaintiff's assault.  As Defendant asserts, the practices and conduct outlined in these articles and the Little litigation have been addressed and at least partly remedied by Shelby County.  (ECF No. 69 at PageID 1384 (citing Little v. Shelby Cty., Tenn., 384 F. Supp. 2d 1169, 1171 (W.D. Tenn. 2005) ("Since the finding of contempt in [in 2000], Defendants have developed and taken steps to implement a new remedial scheme that has alleviated the unconstitutional conditions at the Jail.").)  Plaintiff fails to point to any data from the last decade.

Plaintiff also points to the deposition testimony of Kirk Fields to argue that the risk of rape in jail was well known.  Indeed, it was, but that is not the end of the inquiry.  The inquiry is whether in light of that known risk of inmate assault, Shelby County's deliberate indifference or tacit approval of unconstitutional conduct was such that it amounted to a "moving force" behind Plaintiff's assault.  Here, the answer is no.  The key facts are not in dispute.  Shelby County has a "zero tolerance" policy for inmate-on-inmate sexual contact, employs a PREA Coordinator responsible for PREA compliance and investigation, screens inmates upon intake and classifies

16

them before assigning pods, assigns a Corrections Deputy to make rounds throughout his or her pod, gives an intake orientation to inmates, and separates parties after incidences of sexual assault. (ECF Nos. 60-2, 67-1.)  Plaintiff's claim of a custom or practice of unconstitutional conduct largely hinges on his alleged misclassification and the alleged negligence of a deputy by failing to make rounds at the policy interval.  Neither points to a larger custom or practice.  Even assuming that Plaintiff should have been classified as high risk and that a patrol of the cell block should have occurred on the night of his attack, this would be an *instance* of poor conduct, not a pattern.

Plaintiff has therefore not put forth evidence to show that practices of misclassification or failing to make rounds were part of a broader pattern at Shelby County.  See, e.g., Nouri v. County of Oakland, 615 Fed.Appx. 291, 296 (6th Cir. 2015) ("But we have never found notice of a pattern of misconduct (or the pattern itself) solely from the mistreatment of the plaintiff … Here, Nouri provides 'no [allegations] of any similar incidents] involving other inmates or 'that any such incidents were ever reported to the current, or any former, Sheriff.'") (internal citation omitted). That a sexual assault occurred based on an *instance* of negligence or even an instance of deliberate indifference is insufficient to show a larger custom or practice of unconstitutional conduct.  While Plaintiff points to other incidents of overcrowding, inappropriate relationships, and riots, he does not put forth evidence of a pattern or custom that led to these instances, or that these other incidents were a moving force behind his reported assault.  (ECF No. 67-2 at PageID 944.)

Furthermore, Plaintiff's use of Defendants internal tracking of reports of sexual assault and rape between 2010–2018 (ECF No. 42-7) is misguided.  The report tracking system is used to assist Shelby County in preventing jail rape.  (ECF No. 67-3 at PageID 981 ("So we do a monthly report of data, and we use that data to gauge our progress and see where we're doing good and where we need to improve at.  This report is a part of that report card that we do monthly.").)

Plaintiff correctly asserts that this direct evidence amounts to knowledge of the risk. It does not however, show tacit approval of unconstitutional conduct such that Shelby County can be deemed the moving force behind Plaintiff's injury. To the contrary, such reporting shows an attempt to remedy and prevent wrongs such as what happened to Plaintiff. See, e.g., Fabian v. New York, 2018 WL 2138619 (S.D.N.Y. May 9, 2018) ("Were liability to be imposed…on the sole basis of a report prepared by a municipal agency—and in this case, a report that was commissioned in an effort to *improve* policing…Agencies would be discouraged from self-evaluation and proactive improvement programs, and the end result would be the very thing that Section 1983 plaintiffs seek to curb, the City's asserted failure to autocorrect.")

### C) Plaintiff's Failure to Train Theory is Not Adequately Plead, and Nonetheless Fails to Show Municipal Liability

Plaintiff also asserts a failure to train theory in his Response in Opposition to the Amended Motion for Summary Judgment. (ECF No. 67-2.) To the extent this theory of liability is encompassed as part of a custom or policy of failing to train employees, it has been considered.

Plaintiffs asserting a § 1983 claim against a municipality on the basis of its "policy of inadequate training or supervision" must prove that the "municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants, thereby showing the necessary policy or custom to establish § 1983 liability." Rayfield v. Grand Rapids, 768 F. App'x 496, 511 (6th Cir. 2019) (quoting City of Canton v. Harris, 489 U.S. 378, 399 (1989)) (internal quotations omitted). In order to prove municipal liability under this theory, the plaintiff must show "(1) that a training program is inadequate to the risks that the officers must perform; (2) that the inadequacy is the result of the [City's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury." Brown v. Chapman,

18

814 F.3d 447, 463 (6th Cir. 2016) (quoting <u>Plinton v. City. of Summit</u>, 540 F.3d 459, 464 (6th Cir. 2008)).   In these "deliberate indifference" cases, a plaintiff must also demonstrate that the constitutional right violated as a result of the municipality's failure to train or supervise its employees was "clearly established."   <u>Arrington-Bey v. City of Bedford Heights</u>, 858 F.3d 988, 995 (6th Cir. 2017) ("The violated right … must be clearly established because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear." (emphasis in original)).

In <u>Connick</u>, the Supreme Court defined those policies that evidence a municipalities' "deliberate indifference" to protected constitutional rights.   <u>Connick v. Thompson</u>, 563 U.S. 51 (2011).   The deliberate indifference standard is a "stringent standard of fault," requiring proof that "a municipal actor disregarded a known or obvious consequence of his action."   <u>Id.</u> at 61 (quoting <u>Bryan County</u>, 520 U.S. at 410).   If the municipality is on "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."   <u>Id.</u>   A municipality's refusal to remedy the problematic policy known to have caused constitutional violations in the past "is the functional equivalent of a decision by the city to violate the Constitution."   <u>Id.</u> at 61–62 (quoting <u>Canton</u>, 489 U.S. at 395).

The Sixth Circuit has recognized that a failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction gives rise to liability of said consequences.   <u>Brown</u>, 814 F.3d at 463–64.   This would be the case, for example, if a municipality failed to instruct deputies on how to appropriate categorize prisoners at high risk of sexual victimization.   <u>Id.</u> (internal citation omitted).

Shelby County first argues that Plaintiff's claim should be barred altogether because it was not plead in the original Complaint.   (ECF No. 69 at PageID 1381.)   Furthermore, it argues that

Plaintiff's reliance on the deposition of Chief Kellerhall is unfounded, because Chief Kellerhall is not a 30(b)(6) deponent and because Captain Lawanda Talley is directly in charge of training of Jail Corrections Deputies.  (Id. at PageID 1382.)  Chief Kellerhall's deposition does show a lack of familiarity with the training protocol and procedures employed by Shelby County.  (ECF No. 67-4.)  But, as Defendant points out, it does not rely on Chief Kellerhall's declaration or testimony in its Amended Motion for Summary Judgment.  (ECF No. 69 at PageID 1382.)  Chief Kellerhall was a declarant in Defendant's Original Motion for Summary Judgment, not its Amended Motion for Summary Judgment.  (Id.)  Defendant's Amended Motion relies on the declaration of Captain Lawanda Talley, who served as the Director of the Shelby County Training Academy from 2011 to December 2018.  (ECF No. 60-7 at PageID 822–23.)

Plaintiff still contends that Shelby County's training is inadequate, relying on the testimony of Chief Kellerhall, who is *not* a declarant in Defendant's Amended Motion for Summary Judgment.  (ECF No. 67-2 at PageID 942.)  Additionally, Plaintiff fails to accurately cite the record with respect to Officer Stephanie Yancey.  Notably, Plaintiff asserts that Officer Yancey "testified that she underwent NO training on her job before she was hired and there was no training before she began working at Shelby County Jail."  (Ex. 42-4 at PageID 403.)  Plaintiff leaves out key portions of Officer Yancey's testimony, including the "yearly in-service" to keep officers up-to-date on new policies and procedures, "physically walking around and checking on every cell in the pod" as part of security checks, shakedowns to search for unauthorized contraband, the 30 minute frequency of security checks, and the three month training academy upon hiring.  (See, generally, ECF No. 42-4.)  Perhaps most critically, Officer Yancey describes the three-month training academy in detail, noting that she was taught "PT," "self-defense," as well as completed

coursework on inter-inmate relations, including "mental minds of inmates," "different types of inmates," and "communicating."  (ECF No. 69-2.)

As Plaintiff acknowledges, the inadequacy in a training program must be closely related to the injury caused.  <u>Brown</u>, 814 F.3d at 463.  Here, that is simply not the case.  While there are likely changes that could improve Training Academy and ongoing training for jail officers, there is nothing in the record to suggest that the training was so inadequate that it amounted to "deliberate indifference" as required by the case law.

## IV.     CONCLUSION

In sum, there exists no genuine dispute of material fact as to whether a custom, practice, or policy of Shelby County caused the Plaintiff's alleged constitutional injury.  Plaintiff has not produced evidence demonstrating a genuine dispute of material fact as to whether Defendant's policies, custom or practice, or failure to train led to Plaintiff's alleged constitutional injury. Because the Court finds that Plaintiff has not produced evidence to support a finding of municipal liability against Shelby County, the Court need not address the additional arguments raised by the Defendant's Amended Motion for Summary Judgment and Reply.

**SO ORDERED**, this 9th day of October, 2020.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE